## STEVENS *v.* GRIFFITH.

IN ERROR TO THE SUPREME COURT OF TENNESSEE.

Submitted February 4th, 1884.—Decided March 17th, 1884.

*Rebellion.*

A judgment of a Confederate court during the rebellion confiscating a claim due to a loyal citizen residing in a loyal State, and payment of the claim to a Confederate agent in accordance with the judgment, are no bar to a recovery of the claim. *Williams* v. *Bruffy,* 96 U. S. 176, and 102 U. S. 248, cited and its principal points restated and affirmed.

This was an action in a State court in Tennessee to recover a legacy bequeathed the plaintiff by a will proved in Monroe County, Tennessee, in 1859. The defence set up a judgment of a Confederate court, during the rebellion, confiscating the legacy and payment of the judgment. The defence was overruled in the court below where the original trial was had, and sustained in the Supreme Court of Tennessee on appeal. The plaintiff below then sued out this writ of error.

*Mr. James M. Durham* for plaintiff in error.

No brief filed for defendant in error.

MR. JUSTICE FIELD delivered the opinion of the court.

In October, 1858, Jesse Rhea died in Tennessee, leaving a will containing various legacies to parties residing in that State, and in Illinois and California. The will was admitted to probate in 1859, and the defendant Griffith, one of the executors named therein, qualified and entered upon the discharge of his duties. In the course of the two years following, the effects and property of the estate were converted into money, its debts settled, and the portions paid to which the legatees in Tennessee were entitled. The executor was desirous of paying the balance to the legatees in Illinois and California; but owing to the civil war, he could not communicate with them nor remit the money. In 1863, whilst this balance was still in his possession, he was notified, under proceedings of a court at Knoxville, Tennessee, established by the Confederate government, to pay the amount to a Confederate agent. On his refusal, suit was brought against him in that court, and judgment recovered for the amount, under a law of the Confederate Congress, passed to sequestrate and confiscate the property of residents of the loyal States. Upon this judgment, he paid over the money. In 1867, legatees in Illinois commenced two suits in equity against him and the sureties on his bond to compel the payment of their share of the estate. These suits were consolidated, and he set up in bar the judgment of the Confederate court, and averred that the State of Tennessee was then in the hands of the rebel authorities, both civil and military; that he was threatened by them with punishment if he did not comply with the judgment; that he believed it would be dangerous to refuse compliance; that the officers had the power to seize his property, and to arrest and imprison him; and that under his fears he paid the money.

The question, whether the payment, under these circumstances, constitutes a bar to the relief prayed is closed by previous adjudications of this court. The effect of confiscation proceedings of the insurrectionary government to protect a party who during the war paid under them to Confederate agents moneys owing to citizens of loyal States, was much considered in *Williams* v. *Bruffy*, 96 U. S. 176. That was an

action for goods sold by the plaintiffs, residents of Pennsylvania, in March, 1861, to a resident of Virginia, and he having died was brought against the administrator of his estate. The defendants set up in bar the organization of the Confederate government; the existence of war between it and the United States; its enactment of a law providing for the sequestration of the effects, credits, and property of residents in the loyal States, termed alien enemies, and making it a misdemeanor for a person having or controlling any such property to refuse to give information of it to the receiver of the Confederate States, and place the same, so far as practicable, in his hands; that this law being in force, the intestate, in January, 1862, paid the amount claimed to such receiver; and also that the debt due was sequestrated by a decree of a Confederate district court in Virginia, upon the petition of the receiver, who afterwards collected it with interest. The courts in Virginia sustained the defence, but this court reversed their decision, and subsequently directed judgment for the plaintiffs. 102 U. S. 248. In the extended consideration given to the questions presented, we held that the Confederate government, formed in the face of the prohibition of the Constitution against any treaty, alliance, or confederation of one State with another, could not be regarded as having any legal existence; that whatever efficacy the enactment pleaded possessed in Virginia arose from the sanction given it by that State. If enforced as a law there it would be considered, as a statute, not of the Confederacy, but of the State, and treated accordingly. Any enactment, to which a State gives the force of law, whether it has gone through the usual stages of legislative proceedings, or been adopted in other modes of expressing the will of the State, is a statute of the State within the meaning of the acts of Congress touching our appellate jurisdiction. As a statute of Virginia, it was repugnant to the Constitution; and the decision of the courts of that State, sustaining its validity, gave us jurisdiction to review their judgment. It not only impaired the obligation of the contract of the deceased with the plaintiffs, but it undertook to relieve him from all liability to them. It also discriminated against them as citizens of a loyal State, and refused to

them the same privileges accorded to citizens of Virginia, contrary to the clause of the Constitution declaring that "the citizens of each State shall be entitled to all the privileges and immunities of citizens in the several States."

So, in this case, the Confederate enactment, under which the confiscation of the money was had, can be treated only as a statute of Tennessee, by whose sanction it was enforced as a law of that State. As such it was repugnant to the Constitution and laws of the United States. It authorized the seizure and confiscation of the property of loyal citizens upon no other ground than their loyalty, and for the purpose of raising funds to support an armed rebellion against the authority of the United States. No opinion of the Supreme Court of Tennessee is in the record, but its decision sustaining the defence was necessarily in favor of the validity of the enactment. Our jurisdiction, therefore, attaches to review its judgment.

There can be no question of the right of the plaintiff in error to recover her share of the estate which belonged to her deceased mother, one of the legatees under the will, against any defence founded upon the proceedings pleaded. Viewed from the standpoint of the Constitution, the Confederate government was nothing more than the military representative of the insurrection against the authority of the United States. The belligerent rights conceded to it in the interest of humanity, to prevent the cruelties which would have followed mutual reprisals and retaliations, were, from their nature, such only as existed during the war. Their concession led to arrangements between the contending parties to mitigate the calamities of the contest. It placed those engaged in actual hostilities on the footing of persons in legitimate warfare; but it gave no sanction to hostile legislation, and in no respect impaired the rights of loyal citizens of a loyal State. Their right and their title to property which they possessed in the insurrectionary States before the war were not thereby divested or rendered liable to forfeiture. Their visible and tangible property may have been destroyed by violence or seized by insurgents and carried away; and in such cases the occupants or parties in possession may perhaps be relieved from liability, as having

been subjected to a force too powerful to be resisted. "But," as said in *Williams* v. *Bruffy*, " debts not being tangible things subject to physical seizure and removal, the debtors cannot claim release from liability to their creditors by reason of the coerced payment of equivalent sums to an unlawful combination. The debts can only be satisfied when paid to the creditors to whom they are due, or to others by direction of lawful authority." And, as we there observed, ' It would be a strange thing if the nation, after succeeding in suppressing the rebellion and re-establishing its authority over the insurrectionary district, should, by any of its tribunals, recognize as valid the demand of the rebellious organization to confiscate a debt due to a loyal citizen as a penalty for his loyalty. Such a thing would be unprecedented in the history of unsuccessful rebellions, and would rest upon no just principle."

In the consideration of transactions between citizens of the insurrectionary districts, no disposition has been manifested by this court, and none exists, to interfere with the regular administration of the law, or with the ordinary proceedings of society in their varied forms, civil or political, except when they tended to impair the just authority of the general government, or the rights of loyal citizens. Transactions which thus affect the government or the individual can never be upheld in any tribunal which recognizes the Constitution of the United States as the supreme law of the land.

Neither the unlawful proceedings of the Confederate government nor the judgment of its unauthorized tribunal exempts the executor from liability. It may, indeed, as he asserts, be a hardship upon him to compel him to pay the money again which he has once paid to others. This hardship, however, comes not from the regular administration of the law, under the Constitution, but from the violence of the insurrectionary movement in which he participated. As Chief Justice Chase said : " Those who engage in rebellion must consider the consequences. If they succeed, rebellion becomes revolution, and the new government will justify its founders. If they fail, all their hostile acts to the rightful government are violations of law, and originate no rights which can be recognized by the

courts of the nation whose authority and existence have been alike assailed." *Shotbridge* v. *Macon*, Chase's Decisions, 136.

The executor cannot escape the consequences of the insurrection in the community of which he was a member, whatever may have been his individual feelings and wishes as to its action. Besides, also, if questions of hardship are to be considered, the plaintiff might put in her claim there.

*The judgment of the Supreme Court must be reversed, and the cause remanded, with directions to affirm the decree of the Chancery Court of Monroe County, so far as concerns the claim of the plaintiff Eliza Stevens, who alone has brought the case here; and it is so ordered.*